Raymond G. Robinson, #94408
Robinson-Legal
41955 Fourth Street, Ste. 310
Temecula, CA 92590
951-699-8200 fax: 800-704-4326
fosscap@mac.com
Attorneys for Plaintiffs
PETER FODOR, BARBARA FODOR and
CHANEL AIR LLC

FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

JUL 1 0 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                         DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER FODOR, an individual, BARBARA FODOR, an individual, and CHANEL AIR, LLC, a California limited liability company, | **Case No.: CV11-08496-MMM (RZx)** |
| Plaintiffs, | **SECOND AMENDED COMPLAINT FOR:** |
| v. | 1.   **DAMAGES [15 U.S.C. §78 j]** |
| MICHAEL IAN BLAKEY, aka Michael Blake, aka Lord Michael Blakey, an individual, MICHAEL BLAKEY, INC. , a California corporation, THE MICHAEL BLAKEY REVOCABLE TRUST, a trust, MICHAEL BLAKEY TRUST, a trust, THE BLAKE REVOCABLE TRUST, a trust, BLAKE TRUST, a trust, STUART A. GOLDSMITH, an individual, EUROTECH WHEELS, LLC, a Florida limited liability company, dba Wheel Tec, PYLON INTERNATIONAL, INC. a Nevada corporation, CHARLIE AIR, LLC, an entity of unknown origin, DOES 1 through 20, inclusive, | 2.   **BREACH OF CONTRACT** <br><br> 3.   **NEGLIGENT MISREPRESENTATION** <br><br> 4.   **FRAUD AND DECEIT** <br><br> 5.   **CALIFORNIA PENAL CODE §496** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

RECEIVED
BUT NOT FILED

JUL 1 0 2012

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY                         DEPUTY

Plaintiffs, PETER FODOR, an individual, and BARBARA FODOR, an individual, husband and wife, CHANEL AIR LLC, a California limited liability company by their

SECOND AMENDED COMPLAINT   - 1 -

1  attorney, for their Complaint against Defendants MICHAEL IAN BLAKEY, aka

2  Michael Blake, aka Lord Michael Blakey, an individual, MICHAEL BLAKEY, INC. , a

3  California corporation, THE MICHAEL BLAKEY REVOCABLE TRUST, a trust,

4  MICHAEL BLAKEY TRUST, a trust, THE BLAKE REVOCABLE TRUST, a trust, BLAKE

5  TRUST, a trust, STUART A. GOLDSMITH, an individual, EUROTECH WHEELS, LLC, a

6  Florida limited liability company, dba Wheel Tec,  PYLON INTERNATIONAL, INC. a

7  Nevada corporation, CHARLIE AIR, LLC, an entity of unknown origin, DOES 1

8  through 20, inclusive, (hereinafter collectively referred to as "Defendants")

9  alleges as follows:

10  **JURISDICTION AND VENUE**

11      1.      The First Claim of this action arises under the Securities and

12  Exchange Act of June 6, 1934, Chapter 4, Stat. 881, 15 U.S.C. Section 78j and Rule

13  10b-5 promulgated pursuant thereto as hereinafter more fully appears.

14      2.      The Court has jurisdiction over Plaintiffs' First Claim for relief under

15  28 U.S.C. Section 1331, and 15 U.S.C. Section 78aa.

16      3.      The Court has jurisdiction over Plaintiffs' Second, Third, Fourth, and

17  Fifth Claims for Relief under 28 U.S.C. Section 1367(a).

18      4.      Venue is proper in this district pursuant to 28 U.S.C. Section 1391 (b)

19  and 15 U.S.C. Section 78aa, because all funds invested in the transaction

20  constituting the violation occurred and originated within this District.

21  **PARTIES**

22  **Plaintiffs**

23      5.      Plaintiff PETER FODOR ("Dr. Fodor") is an individual residing in Los

24  Angeles County, California. He is by profession a plastic surgeon.

25      6.      Plaintiff BARBARA FODOR ("Mrs. Fodor") is an individual residing in

26  Los Angeles County California, and the wife of Dr. Fodor.

27      7.      Plaintiff CHANEL AIR, LLC ("Chanel Air"), is a California limited liability

28  company, of which Dr. Fodor and Mrs. Fodor are the sole members, and Dr. Fodor

1  the Managing Member. Plaintiffs are informed, believe and thereon allege that

2  Chanel Air was formed by Mr. Blakey (defined below) as an investment vehicle.

3

4  **Defendants**

5       8.      Plaintiffs are informed, believe and thereon allege that Defendant

6  MICHAEL IAN BLAKEY ("Mr. Blakey"), is an individual residing in Beverly Hills, Los

7  Angeles County, California, and that he is also known as Michael Blake and as Lord

8  Michael Blakey. Mr. Blakey was born in the British Isles.

9       9.      Plaintiffs are informed, believe and thereon allege that Defendant

10 MICHAEL BLAKEY INC. ("Blakey Inc.") is a California corporation, of which Mr.

11 Blakey is the sole shareholder, sole director, and president and sole officer. The

12 company is listed by the California Secretary of State a "dissolved".

13      10.     Plaintiffs are informed, believe and thereon allege that Defendant

14 THE MICHAEL BLAKEY REVOCABLE TRUST ("MB Revocable Trust") is a trust of

15 which Mr. Blakey is the sole trustor, sole trustee and sole beneficiary.

16      11.     Plaintiffs are informed, believe and thereon allege that Defendant

17 MICHAEL BLAKEY TRUST ("Blakey Trust 1") is a trust of which Mr. Blakey is the

18 sole trustor, sole trustee and sole beneficiary. Plaintiffs are informed, believe and

19 thereon allege that this may be the same entity as the MB Revocable Trust.

20      12.     Plaintiffs are informed, believe and thereon allege that Defendant

21 THE BLAKE REVOCABLE TRUST ("Blake Trust 1") is a trust of which Mr. Blakey is

22 the sole trustor, sole trustee and sole beneficiary. Plaintiffs are informed, believe

23 and thereon allege that this may be the same entity as the MB Revocable Trust.

24      13.     Plaintiffs are informed, believe and thereon allege that Defendant

25 BLAKE TRUST ("Blake Trust 2") is a trust of which Mr. Blakey is the sole trustor,

26 sole trustee and sole beneficiary. Plaintiffs are informed, believe and thereon

27 allege that this may be the same entity as the MB Revocable Trust.

28

14.   Collectively the MB Revocable Trust, Blakey Trust 1, Blake Trust 1, and Blake Trust 2, are referred to herein as the "Trusts".

15.   Plaintiffs are informed, believe and thereon allege that Defendant STUART A. GOLDSMITH ("Goldsmith") is an individual, a medical doctor, residing in Tampa, Hillsborough County, Florida.

16.   Plaintiffs are informed, believe and thereon allege that Defendant EUROTECH WHEELS, LLC ("EuroTech"), is a Florida limited liability, doing business in Tampa, Hillsborough County, Florida, and uses the dba Wheel Tec. Currently, the members of the LLC are Plaintiff Peter Fodor, and Defendant Goldsmith, with Goldsmith as the Managing Member. Plaintiffs are informed, believe and thereon allege that EuroTech was formed by Mr. Blakey as an investment vehicle.

17.   Plaintiffs are informed, believe and thereon allege that Defendant PYLON INTERNATIONAL INC. ("Pylon") is a Nevada corporation, and that it was formed by Mr. Blakey as an investment vehicle. Plaintiffs are informed, believe and thereon allege that Pylon is listed as "active" by the Nevada Secretary of State, but that its authorization to do business in California, a qualification it held at one time, has been revoked.

18.   Plaintiffs are informed, believe and thereon allege that Defendant CHARLIE AIR LLC ("Charlie Air") is an entity of unknown origin, and that it was formed by Mr. Blakey as an investment vehicle.

19.   Collectively, Defendants EuroTech, Pylon, Charlie Air and Plaintiff Chanel Air are referred to herein as the Investment Companies.

20.   Plaintiffs are ignorant of the true names and a capacity of Defendants sued herein as DOES 1 through 20, and therefore sues said Defendant DOES by such fictitious names. Plaintiffs will amend its Complaint to allege Defendant DOES' true names and capacities when the same have been ascertained. Plaintiffs are informed, believes and based thereon alleges that each of the fictitiously

1  named Defendants is responsible in some manner for each of the wrongful acts or
2  omissions alleged herein.
3       21.    Plaintiffs are informed, believe and thereon allege that at all times
4  herein mentioned, each of the Defendants was the agent and employee of each
5  of the remaining Defendants and, in doing the things hereafter alleged, was acting
6  within the course and scope of such agency and employment and with the
7  permission and consent of the remaining Defendants.

8                              **Relevant Non-Party**

9       22.    Don Johnson is a famous and talented Hollywood actor who became
10  famous starring in a television series known as "Miami Vice".

11

12              **FACTS RELEVANT TO ALL CAUSES OF ACTION**
13                     **MR. BLAKEY'S OPERATIONS**

14       23.    In or about 2004, Mr. Blakey introduced himself to Peter and Barbara
15  Fodor as a famous record producer, business manager for major television, movie
16  and recording artists, and as a successful, multi-million dollar business executive
17  with extensive experience helping his "famous clientele" to manage their money
18  by allowing him to manage their investments.  He indicated that his business
19  consisted of assisting recording artists, and the like, first make their money
20  through his services in the talent area of the business, and then once they had
21  made their money off of their talent, he applied his business acumen as their
22  business manager to help them grow their fortunes through his services as a
23  business manager and investment adviser.
24       24.    Mr. Blakey also stated he was a British "Lord" and was recognized for
25  his business acumen both in the England and in the United States.
26       25.    Later in 2004, after a period of currying the favor and good graces of
27  the Fodors, Mr. Blakey approached Peter Fodor about using Mr. Blakey's
28  "extensive talents" in "managing money" to manage Dr. Fodor and Mrs. Fodor's

1  investment portfolio, encouraging them to "allow" Mr. Blakey to share with them

2  the same talents and financial acumen he used to make his "famous clientele"

3  fabulously rich.

4      26.    Mr. Blakey described to Dr. Fodor and Mrs. Fodor various

5  investments in securities, stock, corporations, and the like where he had

6  successfully managed his clients' moneys to make millions of dollars. He described

7  himself as a stock broker, investment adviser and business manager and

8  specifically stated that he had all of the necessary qualifications and licenses

9  required to serve as an investment adviser. He made these representations

10  repeatedly as to his acumen, and licensing, including in particular at a dinner at

11  Taninos on Westwood Boulevard, in West Los Angeles, CA, on or about December

12  12, 2003. Mr. Blakey at this time stated his "clientele" of which he wanted the

13  Fodors to be part, had entrusted him with tens and tens of millions of dollars

14  which he held and invested for them. In particular, the Fodors understood that

15  Mr. Blakey's "client portfolio" was in the $50,000,000 to $100,000,000 range.

16      27.    Mr. Blakey described that the Fodors could have faith in him because

17  he "put his money where his mouth was". He stated that he would invest in the

18  same projects as his clients, so that they would have confidence that the

19  investment was of low risk, else why would Mr. Blakey risk his own money.

20      28.    Mr. Blakey further described to the Fodors his success in taking his

21  clients' money, investing in stock or shares of existing companies, of growing the

22  company and then selling the shares to other investors or the public at a profit.

23      29.    He also stated that on occasion, he would find a technology or other

24  business asset and start a business by forming a company to exploit the

25  technology or asset. Once again, he stated his investors earned money through

26  the growth in value of their capital investment.

27      30.    When the Fodors expressed a lack of interest in themselves taking

28  the personal time to run a business new to them, or form a new entity to begin a

1 new business, Mr. Blakey assured them that they, like his fabulously wealthy

2 clientele, would be "passive investors", that he would personally manage, or have

3 members of his staff under his personal supervision manage, each investment,

4 and run each company so as to increase the share value. He reiterated that all the

5 Fodors had to do was to cash the checks they would receive from the

6 investments. He stated he would take no management fee or other income from

7 any business he managed until his investors were making a profit on their

8 investment in the business.

9      31.    Thereafter, over a period of years up through and including through

10 March 31, 2011, Mr. Blakey took some $8,000,000 of the Fodor's money and

11 invested it for them in, as far as is known to them, seven investments.  Mr. Blakey

12 repeatedly assured the Fodors that their investment was but a small part of the

13 portfolio of tens of millions of dollars he managed for his fabulously clientele.

14      32.    The true facts were than Mr. Blakey knew that he was not licensed by

15 the SEC as an investment advisor or securities broker in 2004 or at any time since

16 then, and that he had no intention of becoming so licensed.

17      33.    Mr. Blakey also knew that he was not licensed by the State of

18 California for the purposes of selling securities to investors, either as an

19 investment advisor or securities broker in 2004, or at any time since then, and he

20 knew he had no intention of becoming so licensed.

21      34.    Mr. Blakey also knew at the time he made his statements to the

22 Fodors that none of his record producing clients or TV stars or motion picture

23 stars, had had their investments managed by him, much less successfully

24 managed by him.

25      35.    Mr. Blakey also knew that he had not earned multiple tens of millions

26 of dollars for his "clientele".

27      36.    It was further true that Mr. Blakey knew that he did not have a

28 portfolio of $50,000,000 to $100,000,000 of client funds that he managed.

SECOND AMENDED COMPLAINT  - 7 -

37.   The Fodors, not knowing that Mr. Blakey's statements were false, reposed confidence in him, and his success with his portfolio of client funds, and they invested over $8,000,000 with Mr. Blakey.

38.   The investments are described below are in no particular order.

## Investment One: Russian Diamonds

39.   As shown in greater detail below, from 2004 through 2011, Mr. Blakey stated to the Fodors that he had access to several millions of dollars in diamonds and jewelry from Russia from the "regime change". He stated he obtained the loose diamonds and jewelry directly from his contact in Russia. Mr. Blakey explained that the Fodors would be investing with him at "wholesale prices" and that on a wholesale basis the loose diamonds and jewelry were worth three to four times what he, Mr. Blakey, paid for them. He explained to the Fodors that on a retail basis, the diamonds and jewelry were worth two or three times what they were worth on a wholesale basis.

40.   He explained that their role in the investment was as passive investors, that he would hold the diamonds for them, or if they chose, they could hold the diamonds themselves.

41.   He further explained that at the "appropriate time" he would contact them, and sell the diamond on their behalf. He stated he was selling the loose diamonds and jewelry to them at about his costs, and that he would make his profit later when he sold the diamonds, splitting the profit 50-50 with the Fodors.

42.   From January 4, 2004 through and including March 31, 2011, Mr. Blakey gave as the reason the stones/jewelry were such a great buy was that he sourced them from Russia. Mr. Blakey knew these representations were false because he knew he was not buying the stones/jewelry from any Russian source, and he knew that they were only worth, at retail, approximately one-third to one-half of what he sold them for to Barbara Fodor. Said another way, he knew he

1   was paying $16,000 for a particular batch of stones, and knew he was selling them

2   to Mrs. Fodor for $32,671.00, and he knew they did not come from some Russian

3   royal family, and he knew that it was not the break-up of the former Soviet Union

4   that gave rise to the stones being sold quickly at a fraction of their "true value". In

5   fact, as will be described below, he confessed to his wife that he knew all of these

6   representations were false when he made them.

7       43.    From January 2004 through May of 2007 the Fodors made a series of

8   32 payments for a total of $1,251,524.00 to pay for the loose diamonds/jewelry.

9   All payments were to Mr. Blakey. There were as follows:

10          a.    1/4/2004, Check # 7827 paid to Michael Blakey for $32,671.00.

11  On that date, or perhaps the day before, Mr. Blakey indicated in a conversation

12  with Barbara Fodor that the money was for the purchase of loose diamonds

13  from his Russian source at below market rates and that the stones were worth,

14  on a wholesale basis, 2-4 times what Mrs. Fodor was paying for them. These

15  representations meant that if sold at retail, using the most conservative of Mr.

16  Blakey's representations, they should have been worth at retail $196,026

17  [$32,671 x 2 (conversion factor from purchase price to wholesale price) x 3

18  (conversion factor from wholesale price to retail price)]. The actual value of this

19  purchase was approximately $16,000, one-half of the purchase price. Thus, Mr.

20  Blakey had represented that $16,000 worth of diamonds were worth $196,026.

21  The truth was that Mr. Blakey had no "Russian Source", that the stones sold to

22  the Fodors were procured by Mr. Blakey himself not from Russia, and that they

23  were worth 50% or less of the price paid for them by this check. Mr. Blakey

24  knew these representations were false when made and he later confessed to his

25  wife that there were no Russian sources, that he knew the price he paid for the

26  diamonds/jewelry was one-third to one-half of what he sold them for to the

27  Fodors [after he had represented to Barbara Fodor that he was selling them for

28  about his cost], and further confessed that the reason he sold the diamonds to

the Fodors was so he could make a lot of money off of them. He admitted that the Fodors were not really investing at all, but were simply buying diamonds for much more than they were worth. He made a similar confession on May 31, 2011, to Dr. Fodor when he met him for lunch at Factor's Deli, as described hereinafter. His confessions to his wife and Dr. Fodor, discussed below.

      b.  1/15/2004, Check # 7860 for $13,400.00. On that date, or perhaps the day before, Barbara Fodor had another conversation with Mr. Blakey regarding a second purchase of Russian diamonds/jewelry. He represented that he was selling the stones for about his cost. Once again, Mr. Blakey stated to Barbara Fodor that the money was for the purchase of loose diamonds from his Russian source at below market rates and that the stones were worth, on a wholesale basis, 2-4 times what Mrs. Fodor was paying for them. These representations meant that if sold at retail, using the most conservative of Mr. Blakey's representations, they should have been worth at retail $80,400 [$13,400 x 2 (conversion factor from purchase price to wholesale price) x 3 (conversion factor from wholesale price to retail price)]. The actual value of this purchase was approximately $6,500, one-half of the purchase price. Thus, Mr. Blakey had represented that $13,400 worth of diamonds were worth $80,400 when they were actually worth about $6,500. The truth was that Mr. Blakey had no "Russian Source", that the stones sold to the Fodors were procured by Mr. Blakey himself not from Russia, and that they were worth 50% or less of the price paid for them by this check. Mr. Blakey knew these representations were false when made and he later confessed to his wife that there were no Russian sources, that he knew the price he paid for the diamonds/jewelry was one-third to one-half of what he sold them for to the Fodors [after he had represented to Barbara Fodor that he was selling them for about his cost], and further confessed that the reason he sold the diamonds to the Fodors was so he could make a lot of money off of them. He admitted that

1   the Fodors were not really investing at all, but were simply buying diamonds for

2   much more than they were worth. He made a similar confession on May 31,

3   2011, to Dr. Fodor when he met him for lunch at Factor's Deli, as described

4   hereinafter. His confessions to his wife and Dr. Fodor discussed below.

5          c.   2/5/2004, Check # 7884 paid to Michael Blakey for $10,800.00.

6   On that date, or perhaps the day before, Barbara Fodor had another

7   conversation with Mr. Blakey regarding a third purchase of Russian

8   diamonds/jewelry. He represented that he was selling the stones for about his

9   cost. Once again, Mr. Blakey reaffirmed to Barbara Fodor that the money was

10  for the purchase of loose diamonds from his Russian source at below market

11  rates and that the stones were worth, on a wholesale basis, 2-4 times what Mrs.

12  Fodor was paying for them. Using the same arithmetic shown above, this means

13  that he purchased stones for about $5,000 and represented they were worth

14  about $64,800. As with the first two purchases, Barbara Fodor confirmed with

15  Mr. Blakey the same representations he had made to her on the previous to

16  purchases, to wit: that these particular stones were from Blakey's special

17  Russian sources, were being sold to her at roughly his costs and that they were

18  worth at wholesale 2-4 time what she was paying, and the retail price was 3-4

19  times the wholesale price. Just as with the earlier purchases, the truth for this

20  purchase was that Mr. Blakey had no "Russian Source", that the stones sold to

21  the Fodors were procured by Mr. Blakey himself not from Russia, and that they

22  were worth 50% or less of the price paid for them by this check. Mr. Blakey

23  knew these representations were false when made and he later confessed to his

24  wife that there were no Russian sources, that he knew the price he paid for the

25  diamonds/jewelry was one-third to one-half of what he sold them for to the

26  Fodors, and further confessed that the reason he sold the diamonds to the

27  Fodors was so he could make a lot of money off of them. He admitted that the

28  Fodors were not really investing at all, but were simply buying diamonds for

much more than they were worth. He made a similar confession on May 31, 2011, to Dr. Fodor when he met him for lunch at Factor's Deli, as described hereinafter. His confessions to his wife and Dr. Fodor discussed below.

      d.   2/5/2004, Check # 7885 paid to Michael Blakey for $4,500.00. This was a second check from Barbara Fodor for another group of stones purchased on the same date and was part of the same conversation as described in subparagraph c, immediately above.

      e.   7/28/2005, Check # 9543 paid to Michael Blakey for $11,000. Once again, on that date, or perhaps the day before, Barbara Fodor had another conversation with Mr. Blakey regarding this fourth purchase of Russian diamonds/jewelry. He represented that he was selling the stones for about his cost. Once again, Mr. Blakey reaffirmed to Barbara Fodor his representations of (i) his Russian Sources, (ii) that he was selling at about what he paid for the stones, (iii) that at wholesale they were worth 2-4 times what Mrs. Fodor was paying for them. Using the same arithmetic shown above, this means that he purchased stones for about $5,500 and represented they were worth about $66,000. As with earlier purchases, the truth for this purchase was that Mr. Blakey knew he had no "Russian Source", knew the stones sold to the Fodors were procured by Mr. Blakey himself not from Russia, and that they were worth 50% or less of the price paid for them by this check. His knowledge of the true facts is confirmed by his confessions to his wife, and Dr. Fodor, as described in detail below. But to summarize for here: Mr. Blakey confessed to his wife that there were no Russian sources, that he knew the price he paid for the diamonds/jewelry was one-third to one-half of what he sold them for to the Fodors, and confessed that his reason he selling to the Fodors was so he could make a large profit off of this transaction. He admitted to his wife the fact he knew the Fodors were not really investing at all, but were simply buying diamonds for much more than they were worth. He made a similar confession

1  on May 31, 2011, to Dr. Fodor when he met him for lunch at Factor's Deli, as

2  described hereinafter, where he admitted this, and the other "Russian

3  diamond/jewelry" sales were frauds committed by him. His confessions to his

4  wife and Dr. Fodor are discussed in greater detail, below.

5        f.   8/25/2005, Check # 9566 paid to Michael Blakey for $12,000.00.

6  Once again, on that date, or perhaps the day before, as she did before, Barbara

7  Fodor had another conversation with Mr. Blakey regarding this fourth purchase

8  of Russian diamonds/jewelry. The fact that these conversations were becoming

9  "routine" does not alter the fact that before each purchase Ms. Fodor confirmed

10  with Mr. Blakey before writing a check to him that this group of stones she was

11  buying was part of the same series of transactions that had previously taken

12  place. She was not looking to just buy diamonds and invest in diamonds and

13  jewelry generally, she was looking to buy these special purchase "Russian

14  diamonds/Jewelry" that were at the same excellent terms she had previously

15  agreed to with Mr. Blakey.  So once again she spoke to Mr. Blakey and once

16  again he represented that he was selling the stones (i) for about his cost, (i) that

17  they were from his Russian Sources, and (iii) that at wholesale they were worth

18  2-4 times what Mrs. Fodor was paying for them. The arithmetic is the same here

19  as for the previous purchases; the stones were represented to be worth 6 times

20  what she was paying when they were at best worth ½ of what she was paying.

21  Mr. Blakey's knowledge of the true facts was the same as on the prior occasions.

22  Once again, at the time of this transaction he knew he had no "Russian Source",

23  he knew who he purchased the stones from, he knew what he paid for the

24  stones and that it was about ½ of what he charged Barbara Fodor. Once again,

25  his knowledge of the truth is demonstrated from his subsequent confessions to

26  his wife and to Dr. Fodor. But to summarize again: Mr. Blakey confessed to his

27  wife that there were no Russian sources, that he knew the price he paid for the

28  diamonds/jewelry was one-third to one-half of what he sold them for to the

1   Fodors, and confessed that his reason he selling to the Fodors was so he could

2   make a large profit off of this transaction. He admitted to his wife the fact he

3   knew the Fodors were not really investing at all, but were simply buying

4   diamonds for much more than they were worth. He made a similar confession

5   on May 31, 2011, to Dr. Fodor when he met him for lunch at Factor's Deli, as

6   described hereinafter, where he admitted this, and the other "Russian

7   diamond/jewelry" sales were frauds committed by him. His confessions to his

8   wife and Dr. Fodor are discussed in greater detail, below.

9           g.    12/23/2005, Check # 9146 paid to Michael Blakey for

10  $210,000.00.  On or about 12/20/2005, Mr. Blakey indicated in a conversation

11  with Barbara Fodor that he had in addition to loose stones, some stunning

12  pieces of diamond and other rare stone jewelry, and that the jewelry could be

13  purchased for $210,000.00. The fact that Mr. Blakey's representations were

14  becoming "routine" does not alter the fact that before this purchase Ms. Fodor

15  once again confirmed with Mr. Blakey before writing this check to him that this

16  group of stones, diamond jewelry and other rare stone jewelry she was buying

17  was part of the same series of transactions that had previously taken place.

18  Barbara Fodor was not looking to just buy diamonds and invest in diamonds and

19  jewelry generally. She could have made a purchase like that with any jeweler in

20  Los Angeles. She was looking to buy these special purchase "Russian

21  diamonds/Jewelry" that were at the same excellent terms she had previously

22  agreed to with Mr. Blakey and she was especially glad that on this  larger

23  purchase, she was getting the same great deal as before. Why? Because she

24  would make much more money because these diamonds and pieces of jewelry

25  would be worth at retail at least six times what she was paying (over $1.2M).

26  However, this was different in that on this occasion Mr. Blakey and Mrs. Fodor

27  agreed to be a sizeable purchase spread out over several deliveries occurring

28  over what the parties understood to be "a few weeks'" time span. Too, this time

SECOND AMENDED COMPLAINT  - 14 -

1   Mr. Blakey stated that he had lined up a purchase of stones worth "millions" on
2   the same great terms as Mrs. Fodor's earlier purchases. Once again Mrs. Fodor
3   spoke to Mr. Blakey, with even more vigor than previously due to the size of the
4   anticipated purchases Barbara Fodor inquired of Mr. Blakey and he again
5   represented that he was selling the stones and jewelry for all of this
6   contemplated sizeable purchase (i) for about his cost, (ii) that they were from
7   his Russian Sources, and (iii) that at wholesale they were worth 2-4 times what
8   Mrs. Fodor was paying for them. Mr. Blakey's knowledge of the true facts was
9   the same as on the prior occasions. He did not alter his representations to
10  Barbara Fodor, and because he did not alter his factual representations, and
11  because his knowledge had not grown to be less since 8/25/2005, Blakey again
12  knew he had no "Russian Source", he knew who he purchased the stones from,
13  he knew what he paid for the stones and that it was about ½ of what he charged
14  Barbara Fodor. Once again, his actual knowledge of the truth is demonstrated
15  from his subsequent confessions to his wife and to Dr. Fodor. To summarize
16  again: Mr. Blakey confessed to his wife that there were no Russian sources, that
17  he knew the price he paid for the diamonds/jewelry was one-third to one-half of
18  what he sold them for to the Fodors, and confessed that his reason he selling to
19  the Fodors was so he could make a large profit off of this transaction. He
20  admitted to his wife the fact he knew the Fodors were not really investing at all,
21  but were simply buying diamonds for much more than they were worth. He
22  made a similar confession on May 31, 2011, to Dr. Fodor when he met him for
23  lunch at Factor's Deli, as described hereinafter, where he admitted this, and the
24  other "Russian diamond/jewelry" sales were frauds committed by him. His
25  confessions to his wife and Dr. Fodor are discussed in greater detail, below.
26          h.    12/28/2005, Check # 9156 paid to Michael Blakey for
27  $13,000.00.  This is part of the same transaction as paragraph, g, immediately
28  above. This was for a second delivery of loose stones that were not delivered at

1   the same time as the stones covered by the $210,000 check mentioned in

2   subparagraph g, immediately above. But even in this instance, Ms. Fodor

3   confirmed this was part of the "Russian sourced" jewelry and diamonds, which

4   Mr. Blakey confirmed when delivering the stones. Mr. Blakey's confessions to

5   his wife and Dr. Fodor are equally relevant here.

6           i.    12/28/2005, Check # 9158 paid to Michael Blakey for

7   $170,000.00.  This is part of the same transaction as subparagraph, g above. This

8   was for a third delivery of loose stones that were not delivered at the same time

9   as the stones covered by the $210,000 and $13,000 checks mentioned in

10  subparagraphs g and h, immediately above. But again, even in this instance, Ms.

11  Fodor confirmed this was part of the "Russian sourced" jewelry and diamonds,

12  which Mr. Blakey confirmed in his statements to Barbara Fodor when delivering

13  the stones. Mr. Blakey's confessions to his wife and Dr. Fodor are equally

14  relevant here.

15          j.    1/3/2006, Check # 9163 paid to Michael Blakey for $139,000.00.

16  This is part of the same transaction as subparagraph g above. This was for a

17  fourth delivery of loose stones that were not delivered at the same time as the

18  stones covered by the $210,000, $13,000 and $170,000 checks mentioned in

19  subparagraphs g, h and i, immediately above. But once again, even in this

20  instance, Ms. Fodor confirmed this was part of the "Russian sourced" jewelry

21  and diamonds, which Mr. Blakey confirmed in his statements to Barbara Fodor

22  when delivering the stones. Mr. Blakey's confessions to his wife and Dr. Fodor

23  are equally relevant here.

24          k.    1/5/2006, Check # 9168 paid to Michael Blakey for $14,000.

25  This is part of the same transaction as subparagraph g above. This was for a fifth

26  delivery of loose stones that were not delivered at the same time as the stones

27  covered by the $210,000, $13,000, $170,000 and $139,000 checks mentioned in

28  subparagraphs g, h, i, and j immediately above. But once again, even in this

1    instance, Ms. Fodor confirmed this was part of the "Russian sourced" jewelry

2    and diamonds, which Mr. Blakey confirmed in his statements to Barbara Fodor

3    when delivering the stones. Mr. Blakey's confessions to his wife and Dr. Fodor

4    are equally relevant here.

5         l.   1/12/2006, Check # 9198 paid to Michael Blakey for $61,000.

6    This is part of the same transaction as subparagraph g above. This was for a sixth

7    delivery of loose stones that were not delivered at the same time as the stones

8    covered by the $210,000, $13,000, $170,000, $139,000 and $14,000 checks

9    mentioned in subparagraphs g-k immediately above. But once again, even in this

10   instance, Ms. Fodor confirmed this was part of the "Russian sourced" jewelry

11   and diamonds, which Mr. Blakey confirmed in his statements to Barbara Fodor

12   when delivering the stones. Mr. Blakey's confessions to his wife and Dr. Fodor

13   are equally relevant here at showing his knowledge of the falsity of his

14   statements when he made them.

15        m.   1/12/2006, Check # 9199 paid to Michael Blakey for $36,000.00.

16   This is part of the same transaction as subparagraph g above. This was for

17   another lot of loose stones that were delivered at the same time as the stones

18   delivered subparagraph l, immediately above. This was simply another check for

19   the same transaction described above.

20        n.   1/13/2006, Check # 9201 paid to Michael Blakey for $46,820.

21   This is part of the same transaction as subparagraph g above. This was for

22   another delivery of loose stones that were not delivered at the same time as the

23   stones covered by the checks mentioned in subparagraphs g-m immediately

24   above. But once again, even in this instance, Ms. Fodor confirmed this was part

25   of the "Russian sourced" jewelry and diamonds, which Mr. Blakey confirmed in

26   his statements to Barbara Fodor when delivering the stones. Mr. Blakey's

27   confessions to his wife and Dr. Fodor are equally relevant here at showing his

28   knowledge of the falsity of his statements when he made them.

1       o.    1/16/2006, Check # 9203 paid to Michael Blakey for $36,000.00.

2 This is part of the same transaction as subparagraph g above. This was for

3 another delivery of loose stones that were not delivered at the same time as the

4 stones and jewelry covered by the checks mentioned in subparagraphs g-n

5 immediately above. But once again, even in this instance, Ms. Fodor confirmed

6 this was part of the "Russian sourced" jewelry and diamonds, which Mr. Blakey

7 confirmed in his statements to Barbara Fodor when delivering the stones. Mr.

8 Blakey's confessions to his wife and Dr. Fodor are equally relevant here at

9 showing his knowledge of the falsity of his statements when he made them.

10       p.    1/21/2006, Check # 9231 paid to Michael Blakey for $69,500.00.

11 This is part of the same transaction as subparagraph g above. This was for

12 another delivery of loose stones that were not delivered at the same time as the

13 stones and jewelry covered by the checks mentioned in subparagraphs g-o

14 immediately above. While this may seem to be routine, it is to be recalled that

15 in subparagraph g, above, Mr. Blakey committed to produce for purchase

16 diamonds and jewelry worth "millions" of dollars, and that he was representing

17 that he would make these purchases available for Mrs. Fodor as fast as he could

18 procure the diamonds/jewelry available from his special Russian sources, and

19 that he would have to spread it out because he could not procure them for her

20 all at once. However, Mrs. Fodor was aware of the size of the investments in

21 diamonds she was making and while it may seem routine to some, she did not

22 grow lackadaisical or less diligent in confirming on each occasion Mr. Blakey had

23 diamonds/jewelry for delivery that met the criteria that he had represented to

24 her, that this delivery, as well as all the others: Ms. Fodor confirmed with Mr.

25 Blakey before writing a check to him that this group of stones were at the same

26 excellent terms she had previously agreed to with Mr. Blakey, to wit: she spoke

27 to Mr. Blakey and again he represented that he was selling the stones (i) for

28 about his cost, (ii) that they were from his Russian Sources, and (iii) that at

1  wholesale they were worth 2-4 times what Mrs. Fodor was paying for them. The
2  arithmetic is the same here as for the previous purchases; the stones were
3  represented to be worth 6 times what she was paying when they were at best
4  worth ½ of what she was paying.  Mr. Blakey's knowledge of the true facts was
5  the same as on each of the prior occasions. His knowledge of the truth had not
6  diminished just because there were multiple transactions. Once again, at the
7  time of this transaction he knew he had no "Russian Source", he knew who he
8  purchased the stones from, he knew what he paid for the stones and that it was
9  about ½ of what he charged Barbara Fodor. Once again, his knowledge of the
10  truth is demonstrated from his subsequent confessions to his wife and to Dr.
11  Fodor. To summarize again: Mr. Blakey confessed to his wife that there were no
12  Russian sources, that he knew the price he paid for the diamonds/jewelry was
13  one-third to one-half of what he sold them for to the Fodors, and confessed that
14  his reason he selling to the Fodors was so he could make a large profit off of this
15  transaction. He admitted to his wife the fact he knew the Fodors were not really
16  investing at all, but were simply buying diamonds for much more than they were
17  worth. He made a similar confession on May 31, 2011, to Dr. Fodor when he
18  met him for lunch at Factor's Deli, as described hereinafter, where he admitted
19  this, and the other "Russian diamond/jewelry" sales were frauds committed by
20  him. His confessions to his wife and Dr. Fodor discussed below.
21        q.   2/1/2006, Check # 9244 paid to Michael Blakey for $37,000.00.
22  To the best of recollection of Barbara Fodor, this was the last, or perhaps next to
23  last, of the transactions specifically discussed in regards to subparagraph g,
24  above, and while there were later purchases, this was the last (or next to last) of
25  the special "push" that Mr. Blakey had made to Mrs. Fodor on or about
26  December 20, 2005. This delivery was also for loose stones. Once again, even in
27  this instance, Ms. Fodor confirmed this was part of the "Russian sourced"
28  jewelry and diamonds under the same terms as previously agreed to by the

1   parties on each purchase [(i) sold for about his cost, (ii) that the stones were

2   from his Russian Sources, and (iii) that at wholesale the purchased stones were

3   worth 2-4 times what Mrs. Fodor was paying for them], which again Mr. Blakey

4   confirmed in his statements to Barbara Fodor when delivering these stones. Mr.

5   Blakey's confessions to his wife and Dr. Fodor are equally relevant here at

6   showing his knowledge of the falsity of his statements when he made them.

7              r.    2/27/2006, Check # 9286 paid to Michael Blakey for $38,580.00.

8   By this date, the relationship of the parties had returned to about what it was

9   prior to December 2005. The investing in Russian diamonds and jewelry was still

10  done regularly but the major December 2005 push of diamonds/jewelry to Mrs.

11  Fodor has less urgent, more routine, and generally, for lesser amounts of

12  money.  Despite the fact the Fodors had become confident of the favorable

13  representations as to the safety of their investment Mr. Blakey was managing

14  for them in Russian diamonds/jewelry, the Fodors understood that they were

15  investing with him major sums of money for their future financial security and

16  Mrs. Fodor's diligence in trying to protect her financial future and prepare for

17  her husband's eventual retirement, did not diminish her diligence in trying to

18  invest wisely. After all, this investment in Russian jewelry was per Mr. Blakey an

19  especially safe transaction involving diamonds purchased at near miraculously

20  good prices.  So, once again Mrs. Fodor spoke to Mr. Blakey about this particular

21  purchase. Once again, Mr. Blakey chose to represent he was selling the stones

22  and jewelry for this purchase (i) for about his cost, (ii) that they were from his

23  Russian Sources, and (iii) that at wholesale they were worth 2-4 times what Mrs.

24  Fodor was paying for them. Mr. Blakey's knowledge of the true facts was the

25  same as on the prior occasions. He did not alter his representations to Barbara

26  Fodor. He had not grown less aware of the falsity of his representations. Thus,

27  on the date of this purchase, Blakey again knew he had no "Russian Source", he

28  knew who he purchased the stones from, he knew what he paid for the stones

1   and that it was about ½ of what he charged Barbara Fodor. Once again, his

2   actual knowledge of the truth is demonstrated from his subsequent confessions

3   to his wife and to Dr. Fodor. Mr. Blakey confessed to his wife that there were no

4   Russian sources, that he knew the price he paid for the diamonds/jewelry was

5   one-third to one-half of what he sold them for to the Fodors, and confessed that

6   his reason he selling to the Fodors was so he could make a large profit off of this

7   transaction. He admitted to his wife the fact he knew the Fodors were not really

8   investing at all, but were simply buying diamonds for much more than they were

9   worth. He confessed on May 31, 2011, to Dr. Fodor when he met him for lunch

10  at Factor's Deli, as described hereinafter, that each of the Fodor's purchases of

11  "Russian diamond/jewelry" were frauds committed by him, that there was no

12  special Russian sources and that he overcharged them and failed to give them

13  the values he promised. His confessions to his wife and Dr. Fodor are discussed

14  in greater detail, below.

15          s.   3/7/2006, Check # 9293 paid to Michael Blakey for $7,630.00.

16  Again Mrs. Fodor spoke to Mr. Blakey about this particular purchase. Again, Mr.

17  Blakey chose to represent he was selling the stones and jewelry for this

18  purchase (i) for about his cost, (ii) that they were from his Russian Sources, and

19  (iii) that at wholesale they were worth 2-4 times what Mrs. Fodor was paying for

20  them. Mr. Blakey's knowledge of the true facts was the same as on the prior

21  occasions. On the date of this purchase, as before, Blakey knew he had no

22  "Russian Source", he knew who he purchased the stones from, he knew what he

23  paid for the stones and that it was about ½ of what he charged Barbara Fodor.

24  His actual knowledge of the truth is demonstrated from his subsequent

25  confessions to his wife and to Dr. Fodor. Mr. Blakey confessed to his wife that

26  there were no Russian sources, that he knew the price he paid for the

27  diamonds/jewelry was one-third to one-half of what he sold them for to the

28  Fodors, and confessed that his reason he selling to the Fodors was so he could

1   make a large profit off of this transaction. He admitted to his wife the fact he

2   knew the Fodors were not really investing at all, but were simply buying

3   diamonds for much more than they were worth. He confessed on May 31, 2011,

4   to Dr. Fodor when he met him for lunch at Factor's Deli, as described

5   hereinafter, that each of the Fodor's purchases of "Russian diamond/jewelry"

6   were frauds committed by him, that there was no special Russian sources and

7   that he overcharged them and failed to give them the values he promised. His

8   confessions to his wife and Dr. Fodor are discussed in greater detail, below.

9           t.   4/7/2006, Check # 9339 paid to Michael Blakey for $12,500.00.

10  Mrs. Fodor spoke to Mr. Blakey about this particular purchase as she had in the

11  past. Mr. Blakey chose to represent he was selling the stones and jewelry for

12  this purchase (i) for about his cost, (ii) that they were from his Russian Sources,

13  and (iii) that at wholesale they were worth 2-4 times what Mrs. Fodor was

14  paying for them. Mr. Blakey's knowledge of the true facts was the same as on

15  the prior occasions. On the date of this purchase, Blakey knew he had no

16  "Russian Source", he knew who he purchased the stones from, he knew what he

17  paid for the stones and that it was about ½ of what he charged Barbara Fodor.

18  His actual knowledge of the truth is demonstrated from his subsequent

19  confessions to his wife and to Dr. Fodor. Mr. Blakey confessed to his wife that

20  there were no Russian sources, that he knew the price he paid for the

21  diamonds/jewelry was one-third to one-half of what he sold them for to the

22  Fodors, and confessed that his reason he selling to the Fodors was so he could

23  make a large profit off of this transaction. He admitted to his wife the fact he

24  knew the Fodors were not really investing at all, but were simply buying

25  diamonds for much more than they were worth. He confessed on May 31, 2011,

26  to Dr. Fodor when he met him for lunch at Factor's Deli, as described

27  hereinafter, that each of the Fodor's purchases of "Russian diamond/jewelry"

28  were frauds committed by him, that there was no special Russian sources and

that he overcharged them and failed to give them the values he promised. His confessions to his wife and Dr. Fodor are discussed in greater detail, below.

u.    4/7/2006, Check # 9340 paid to Michael Blakey for $13,800.00. Mrs. Fodor spoke to Mr. Blakey about this particular purchase as she had in the past. Mr. Blakey chose to represent he was selling the stones and jewelry for this purchase (i) for about his cost, (ii) that they were from his Russian Sources, and (iii) that at wholesale they were worth 2-4 times what Mrs. Fodor was paying for them. Mr. Blakey's knowledge of the true facts was the same as on the prior occasions. On the date of this purchase, Blakey knew he had no "Russian Source", he knew who he purchased the stones from, he knew what he paid for the stones and that it was about ½ of what he charged Barbara Fodor. His actual knowledge of the truth is demonstrated from his subsequent confessions to his wife and to Dr. Fodor. Mr. Blakey confessed to his wife that there were no Russian sources, that he knew the price he paid for the diamonds/jewelry was one-third to one-half of what he sold them for to the Fodors, and confessed that his reason he selling to the Fodors was so he could make a large profit off of this transaction. He admitted to his wife the fact he knew the Fodors were not really investing at all, but were simply buying diamonds for much more than they were worth. He confessed on May 31, 2011, to Dr. Fodor when he met him for lunch at Factor's Deli, as described hereinafter, that each of the Fodor's purchases of "Russian diamond/jewelry" were frauds committed by him, that there was no special Russian sources and that he overcharged them and failed to give them the values he promised. His confessions to his wife and Dr. Fodor are discussed in greater detail, below

v.    4/14/2006, Check # 9355 paid to Michael Blakey for $12,000.00. Mrs. Fodor spoke to Mr. Blakey about this particular purchase as she had in the past. Mr. Blakey chose to represent he was selling the stones and jewelry for this purchase (i) for about his cost, (ii) that they were from his Russian Sources,

1   and (iii) that at wholesale they were worth 2-4 times what Mrs. Fodor was

2   paying for them. Mr. Blakey's knowledge of the true facts was the same as on

3   the prior occasions. On the date of this purchase, Blakey knew he had no

4   "Russian Source", he knew who he purchased the stones from, he knew what he

5   paid for the stones and that it was about ½ of what he charged Barbara Fodor.

6   His actual knowledge of the truth is demonstrated from his subsequent

7   confessions to his wife and to Dr. Fodor. Mr. Blakey confessed to his wife that

8   there were no Russian sources, that he knew the price he paid for the

9   diamonds/jewelry was one-third to one-half of what he sold them for to the

10  Fodors, and confessed that his reason he selling to the Fodors was so he could

11  make a large profit off of this transaction. He admitted to his wife the fact he

12  knew the Fodors were not really investing at all, but were simply buying

13  diamonds for much more than they were worth. He confessed on May 31, 2011,

14  to Dr. Fodor when he met him for lunch at Factor's Deli, as described

15  hereinafter, that each of the Fodor's purchases of "Russian diamond/jewelry"

16  were frauds committed by him, that there was no special Russian sources and

17  that he overcharged them and failed to give them the values he promised. His

18  confessions to his wife and Dr. Fodor are discussed in greater detail, below

19          w.   4/29/2006, Check # 9390 paid to Michael Blakey for $43,600.00.

20  This purchase was a bit different in that just prior to this purchase, perhaps 1-2

21  days prior, Mr. Blakey told Mrs. Fodor that he had again come into a series of

22  better Russian sourced diamonds/jewelry and that he could supplier her a good

23  stream of products, as he had back in December 2005. Mrs. Fodor spoke to Mr.

24  Blakey about this purchase as she had in the past, and expressed interest in

25  buying more diamonds/jewelry than she had been buying the previous few

26  months. Mr. Blakey chose to represent to Barbara Fodor he was selling the

27  stones and jewelry for this purchase (i) for about his cost, (ii) that they were

28  from his Russian Sources, and (iii) that at wholesale they were worth 2-4 times

1   what Mrs. Fodor was paying for them. Mr. Blakey's knowledge of the true facts
2   was the same as on the prior occasions. On the date of this purchase, Blakey
3   knew he had no "Russian Source", he knew who he purchased the stones from,
4   he knew what he paid for the stones and that it was about ½ of what he charged
5   Barbara Fodor. His actual knowledge of the truth is demonstrated from his
6   subsequent confessions to his wife and to Dr. Fodor. Mr. Blakey confessed to his
7   wife that there were no Russian sources, that he knew the price he paid for the
8   diamonds/jewelry was one-third to one-half of what he sold them for to the
9   Fodors, and confessed that his reason he selling to the Fodors was so he could
10   make a large profit off of this transaction. He admitted to his wife the fact he
11   knew the Fodors were not really investing at all, but were simply buying
12   diamonds for much more than they were worth. He confessed on May 31, 2011,
13   to Dr. Fodor when he met him for lunch at Factor's Deli, as described
14   hereinafter, that each of the Fodor's purchases of "Russian diamond/jewelry"
15   were frauds committed by him, that there was no special Russian sources and
16   that he overcharged them and failed to give them the values he promised. His
17   confessions to his wife and Dr. Fodor are discussed in greater detail, below.
18          x.   5/26/2006, Check # 9417 paid to Michael Blakey for $95,850.00.
19   This purchase was a part of the "bigger supply" of product discussed with Mrs.
20   Fodor in April 2006 (the last subparagraph). Mrs. Fodor spoke to Mr. Blakey
21   about this purchase as she had in the past. She again confirmed that this was
22   not just a routine sell of diamonds she could get from any jeweler in Los
23   Angeles, but part of the special Russian sourcing of Mr. Blakey. Mr. Blakey chose
24   to represent to Barbara Fodor he was selling the stones and jewelry for this
25   purchase (i) for about his cost, (ii) that they were from his Russian Sources, and
26   (iii) that at wholesale they were worth 2-4 times what Mrs. Fodor was paying for
27   them. Mr. Blakey's knowledge of the true facts was the same as on the prior
28   occasions. On the date of this purchase, Blakey knew he had no "Russian

Source", he knew who he purchased the stones from, he knew what he paid for the stones and that it was about ½ of what he charged Barbara Fodor. His actual knowledge of the truth is demonstrated from his subsequent confessions to his wife and to Dr. Fodor. Mr. Blakey confessed to his wife that there were no Russian sources, that he knew the price he paid for the diamonds/jewelry was one-third to one-half of what he sold them for to the Fodors, and confessed that his reason he selling to the Fodors was so he could make a large profit off of this transaction. He admitted to his wife the fact he knew the Fodors were not really investing at all, but were simply buying diamonds for much more than they were worth. He confessed on May 31, 2011, to Dr. Fodor when he met him for lunch at Factor's Deli, as described hereinafter, that each of the Fodor's purchases of "Russian diamond/jewelry" were frauds committed by him, that there was no special Russian sources and that he overcharged them and failed to give them the values he promised. His confessions to his wife and Dr. Fodor are discussed in greater detail, below.

       y.   6/2/2006, Check # 9423 paid to Michael Blakey for $22,230.00. This purchase was a third portion of the "bigger supply" of product discussed with Mrs. Fodor in April 2006 (the penultimate subparagraph). Mrs. Fodor spoke to Mr. Blakey about this purchase as she had in the past. She again confirmed that this was not just a routine sell of diamonds she could get from any jeweler in Los Angeles, but part of the special Russian sourcing of Mr. Blakey. Mr. Blakey chose to represent to Barbara Fodor he was selling the stones and jewelry for this purchase (i) for about his cost, (ii) that they were from his Russian Sources, and (iii) that at wholesale they were worth 2-4 times what Mrs. Fodor was paying for them. Mr. Blakey's knowledge of the true facts was the same as on the prior occasions. On the date of this purchase, Blakey knew he had no "Russian Source", he knew who he purchased the stones from, he knew what he paid for the stones and that it was about ½ of what he charged Barbara Fodor.

His actual knowledge of the truth is demonstrated from his subsequent confessions to his wife and to Dr. Fodor. Mr. Blakey confessed to his wife that there were no Russian sources, that he knew the price he paid for the diamonds/jewelry was one-third to one-half of what he sold them for to the Fodors, and confessed that his reason he selling to the Fodors was so he could make a large profit off of this transaction. He admitted to his wife the fact he knew the Fodors were not really investing at all, but were simply buying diamonds for much more than they were worth. He confessed on May 31, 2011, to Dr. Fodor when he met him for lunch at Factor's Deli, as described hereinafter, that each of the Fodor's purchases of "Russian diamond/jewelry" were frauds committed by him, that there was no special Russian sources and that he overcharged them and failed to give them the values he promised. His confessions to his wife and Dr. Fodor are discussed in greater detail, below.

      z.    6/26/2006, Check # 9452 paid to Michael Blakey for $8,534.00. This purchase was return to the normal flow of available Russian jewelry and diamonds. Mrs. Fodor believes that this was in particular for a piece of jewelry rather than loose stones. She again confirmed that this was not just a routine sell of diamonds she could get from any jeweler in Los Angeles, but part of the special Russian sourcing of Mr. Blakey. Mr. Blakey chose to represent to Barbara Fodor he was selling the stones and jewelry for this purchase (i) for about his cost, (ii) that they were from his Russian Sources, and (iii) that at wholesale they were worth 2-4 times what Mrs. Fodor was paying for them. Mr. Blakey's knowledge of the true facts was the same as on the prior occasions. On the date of this purchase, Blakey knew he had no "Russian Source", he knew who he purchased the stones from, he knew what he paid for the stones and that it was about ½ of what he charged Barbara Fodor. His actual knowledge of the truth is demonstrated from his subsequent confessions to his wife and to Dr. Fodor. Mr. Blakey confessed to his wife that there were no Russian sources, that he knew

SECOND AMENDED COMPLAINT  - 27 -

1 the price he paid for the diamonds/jewelry was one-third to one-half of what he

2 sold them for to the Fodors, and confessed that his reason he selling to the

3 Fodors was so he could make a large profit off of this transaction. He admitted

4 to his wife the fact he knew the Fodors were not really investing at all, but were

5 simply buying diamonds for much more than they were worth. He confessed on

6 May 31, 2011, to Dr. Fodor when he met him for lunch at Factor's Deli, as

7 described hereinafter, that each of the Fodor's purchases of "Russian

8 diamond/jewelry" were frauds committed by him, that there was no special

9 Russian sources and that he overcharged them and failed to give them the

10 values he promised. His confessions to his wife and Dr. Fodor are discussed in

11 greater detail, below.

12           aa.  8/18/2006, Check # 5188 paid to Michael Blakey for $18,680.00.

13 This was a "routine" purchase of loose diamonds. Again, Mrs. Fodor spoke to

14 Mr. Blakey about this purchase. She again confirmed with him personally that

15 this was not just a routine sell of diamonds she could get from any jeweler in Los

16 Angeles, but part of the special Russian sourcing of Mr. Blakey. Mr. Blakey chose

17 to represent to Barbara Fodor he was selling the stones and jewelry for this

18 purchase (i) for about his cost, (ii) that they were from his Russian Sources, and

19 (iii) that at wholesale they were worth 2-4 times what Mrs. Fodor was paying for

20 them. Mr. Blakey's knowledge of the true facts was the same as on the prior

21 occasions. On the date of this purchase, Blakey knew he had no "Russian

22 Source", he knew who he purchased the stones from, he knew what he paid for

23 the stones and that it was about ½ of what he charged Barbara Fodor. His actual

24 knowledge of the truth is demonstrated from his subsequent confessions to his

25 wife and to Dr. Fodor. Mr. Blakey confessed to his wife that there were no

26 Russian sources, that he knew the price he paid for the diamonds/jewelry was

27 one-third to one-half of what he sold them for to the Fodors, and confessed that

28 his reason he selling to the Fodors was so he could make a large profit off of this

1  transaction. He admitted to his wife the fact he knew the Fodors were not really
2  investing at all, but were simply buying diamonds for much more than they were
3  worth. He confessed on May 31, 2011, to Dr. Fodor when he met him for lunch
4  at Factor's Deli, as described hereinafter, that each of the Fodor's purchases of
5  "Russian diamond/jewelry" were frauds committed by him, that there was no
6  special Russian sources and that he overcharged them and failed to give them
7  the values he promised. His confessions to his wife and Dr. Fodor are discussed
8  in greater detail, below.
9          bb.   3/30/2007, Check # 1092 paid to Michael Blakey for $49,024.00.
10  This purchase occurred several months after the last purchase. The reason for
11  this was that Mr. Blakey represented to Barbara Fodor that his sources were
12  drying up. As she had for the previous purchases, she again confirmed that this
13  was not just a routine sell of diamonds she could get from any jeweler in Los
14  Angeles, but part of the special Russian sourcing of Mr. Blakey. Mr. Blakey chose
15  to represent to Barbara Fodor he was selling the stones and jewelry for this
16  purchase (i) for about his cost, (ii) that they were from his Russian Sources, and
17  (iii) that at wholesale they were worth 2-4 times what Mrs. Fodor was paying for
18  them. Mr. Blakey's knowledge of the true facts was the same as on the prior
19  occasions. On the date of this purchase, Blakey knew he had no "Russian
20  Source", he knew who he purchased the stones from, he knew what he paid for
21  the stones and that it was about ½ of what he charged Barbara Fodor. His actual
22  knowledge of the truth is demonstrated from his subsequent confessions to his
23  wife and to Dr. Fodor. Mr. Blakey confessed to his wife that there were no
24  Russian sources, that he knew the price he paid for the diamonds/jewelry was
25  one-third to one-half of what he sold them for to the Fodors, and confessed that
26  his reason he selling to the Fodors was so he could make a large profit off of this
27  transaction. He admitted to his wife the fact he knew the Fodors were not really
28  investing at all, but were simply buying diamonds for much more than they were

worth. He confessed on May 31, 2011, to Dr. Fodor when he met him for lunch at Factor's Deli, as described hereinafter, that each of the Fodor's purchases of "Russian diamond/jewelry" were frauds committed by him, that there was no special Russian sources and that he overcharged them and failed to give them the values he promised. His confessions to his wife and Dr. Fodor are discussed in greater detail, below

cc.   4/5/2007, Check # 1104 paid to Michael Blakey for $9,600.00. Mrs. Fodor spoke to Mr. Blakey about this purchase as she had in the past and he informed her he had a small group of stones from his old Russian sources. She again confirmed that this was not just a routine sell of diamonds she could get from any jeweler in Los Angeles, but part of the special Russian sourcing of Mr. Blakey. Mr. Blakey chose to represent to Barbara Fodor he was selling the stones and jewelry for this purchase (i) for about his cost, (ii) that they were from his Russian Sources, and (iii) that at wholesale they were worth 2-4 times what Mrs. Fodor was paying for them. Mr. Blakey's knowledge of the true facts was the same as on the prior occasions. On the date of this purchase, Blakey knew he had no "Russian Source", he knew who he purchased the stones from, he knew what he paid for the stones and that it was about ½ of what he charged Barbara Fodor. His actual knowledge of the truth is demonstrated from his subsequent confessions to his wife and to Dr. Fodor. Mr. Blakey confessed to his wife that there were no Russian sources, that he knew the price he paid for the diamonds/jewelry was one-third to one-half of what he sold them for to the Fodors, and confessed that his reason he selling to the Fodors was so he could make a large profit off of this transaction. He admitted to his wife the fact he knew the Fodors were not really investing at all, but were simply buying diamonds for much more than they were worth. He confessed on May 31, 2011, to Dr. Fodor when he met him for lunch at Factor's Deli, as described hereinafter, that each of the Fodor's purchases of "Russian diamond/jewelry"

were frauds committed by him, that there was no special Russian sources and that he overcharged them and failed to give them the values he promised. His confessions to his wife and Dr. Fodor are discussed in greater detail, below.

dd. 5/11/2007, Check # 1131 paid to Michael Blakey for $2,805.00. Mrs. Fodor spoke to Mr. Blakey about this purchase as she had in the past and he informed her he had a small group of stones from his old Russian sources. She again confirmed that this was not just a routine sell of diamonds she could get from any jeweler in Los Angeles, but part of the special Russian sourcing of Mr. Blakey. Mr. Blakey chose to represent to Barbara Fodor he was selling the stones and jewelry for this purchase (i) for about his cost, (ii) that they were from his Russian Sources, and (iii) that at wholesale they were worth 2-4 times what Mrs. Fodor was paying for them. Mr. Blakey's knowledge of the true facts was the same as on the prior occasions. On the date of this purchase, Blakey knew he had no "Russian Source", he knew who he purchased the stones from, he knew what he paid for the stones and that it was about ½ of what he charged Barbara Fodor. His actual knowledge of the truth is demonstrated from his subsequent confessions to his wife and to Dr. Fodor. Mr. Blakey confessed to his wife that there were no Russian sources, that he knew the price he paid for the diamonds/jewelry was one-third to one-half of what he sold them for to the Fodors, and confessed that his reason he selling to the Fodors was so he could make a large profit off of this transaction. He admitted to his wife the fact he knew the Fodors were not really investing at all, but were simply buying diamonds for much more than they were worth. He confessed on May 31, 2011, to Dr. Fodor when he met him for lunch at Factor's Deli, as described hereinafter, that each of the Fodor's purchases of "Russian diamond/jewelry" were frauds committed by him, that there was no special Russian sources and that he overcharged them and failed to give them the values he promised. His confessions to his wife and Dr. Fodor are discussed below. After this date, on or

1   about June 10, 2007, Mr. Blakey indicated he had lost his Russian source and

2   could no longer procure diamonds and jewelry for the Fodor's investment.

3       44.     During this entire time period, and as recently as March 31, 2011 at a

4   meeting with Dr. Fodor, Mr. Blakey represented that the time had not come to

5   sell the diamonds and jewelry, that the Fodors should continue to hold them,

6   when in truth he did not want the stones/jewelry sold because it would reveal

7   that the at retail, it was worth less than ½ of what was paid. Later during that

8   same lunch meeting, Mr. Blakey abandoned his "hold on to diamonds"

9   investment advice, when he confessed to Dr. Fodor, after being threatened with

10  the Fodors seeking to recover on all of their investments with Mr. Blakey, that he

11  had committed a fraud on the Fodors and would pay them back by giving them ½

12  of all he made. This promise included his specific representation he would make

13  good on the Fodors' investment in the "Russian" diamonds/jewelry.

14      45.     From 2004 through 2011 Mr. Blakey advised the Fodors that the time

15  to sell had not yet arisen, including as late as March 31, 2011 at a meeting in West

16  Los Angeles, at Factors Deli between Mr. Blakey and Peter Fodor at a restaurant,

17  described hereinbelow in greater detail.

18      46.     In May 2011 the Fodors became suspicious of Mr. Blakey's

19  qualifications as an investment advisor and had the diamonds appraised. They

20  appraised at $580,255, less than one-half of their purchase price. This was in

21  keeping with the statements made to them by Mr. Blakey's ex-wife, Kimberly.

22      47.     At no time did Mr. Blakey furnish to the Fodors a prospectus,

23  financial information, a business plan or other information on the diamond

24  investment scheme. He did, however, withhold the truth as to the value of the

25  diamonds, his purchase price of the diamonds, and he further withheld that their

26  "investment" in diamonds was not any investment at all but was his buying

27  diamonds/jewelry at a low price and selling them to the Fodors at a high price,

28

1  and then concealing his wrong doing by repeatedly telling the Fodors to hang

2  onto their investment diamonds/jewelry.

3       48.    Eventually, on March 31, 2011, Mr. Blakey apologized to Dr. Fodor

4  for all of his, Blakey's deception, that he was going to make it up to them, and

5  that he would not claim that he was entitled to his 50% commission on the sale of

6  the diamonds/jewelry.

7

8                    **Investment 2: EuroTech Wheels**

9                    **Transaction Number 1**

10       49.    In or about May 16, 2004, Mr. Blakey, who was spending time in

11  Florida, telephoned Peter Fodor and told them that he was going to invest an

12  existing business, Defendant EuroTech Wheels LLC ("EuroTech"). He said he was

13  forming a limited liability company to buy an existing business in the custom

14  wheel and automobile accessory business in Florida. He stated that he, Mr. Blakey

15  was to be a 1/3 investor, that another gentleman named Mr. Jeffrey M. Dean

16  would be a 1/3 investor and he was calling to invite Peter Fodor to be the other

17  1/3 investor. Blakey offered the Fodors the role of passive investors, stating that

18  he would manage business on a daily basis, and that he would grow the business

19  including through a large internet presence.

20       50.    Mr. Blakey provided financial information on Eurotech's historical

21  operations (income statement and balance sheet) prior to their making their

22  investment. At the time he produced these financial records to the Fodors he

23  knew that Eurotech's balance sheet showed a large value for inventory, and that

24  thus a large portion of the stated purchase price (three investors times $350,000

25  per investor) was going to be used to pay the seller for the value of the inventory

26  that was being purchased.

27       51.    Mr. Blakey failed to disclose that he had personally inspected the

28  inventory of EuroTech, and that he knew that the inventory consisted of mostly

SECOND AMENDED COMPLAINT   - 33 -

1  obsolete items that should have been scrapped out and removed from Eurotech's
2  inventory. Mr. Blakey failed to make this material disclosure to the Fodors.

3     52.   Mr. Blakey told the Fodors he was putting $350,000 of his own
4  money into EuroTech, and that Mr. Deem had also invested $350,000 in
5  EuroTech.

6     53.   The parties, Mr. Dean, Mr. Blakey and the Fodors also entered into
7  an Operating Agreement in June 2004 for EuroTech. A true and correct copy of
8  the putative Operating Agreement is attached hereto as Exhibit 2.

9     54.   On or about August 4, 2004, Mr. Blakey called Peter Fodor and told
10  him get his money in. Mrs. Fodor wired $150,000 on August 4, 2004 to "EuroTech
11  Wheels LLC" using the wiring information provided by Mr. Blakey, and the Fodors
12  wired $200,000 on August 12, 2004. For the $350,000 the Fodors were given a
13  $300,000 promissory note dated August 12, 2004 which provided for interest at
14  Prime plus 4%, adjusted monthly, and was due in full on August 1, 2010. A true
15  and correct copy of the Note is attached hereto as Exhibit 1.

16     55.   In August 2004, Mr. Blakey knew he did not invest $350,000 and that
17  he had no intention to invest anything in EuroTech. Mr. Blakey knowingly falsified
18  company records to make it look like he had put up his $350,000 share of the
19  investment. It was his intent to do this manipulation in order to receive
20  something, a 1/3rd interest, for literally nothing. His failure to fund his investment
21  meant that EuroTech was undercapitalize, which under capitalization he also
22  failed to disclose to the Fodors.

23     56.   From the beginning of Blakey's involvement in this transaction, as
24  was true of other investments, Blakey agreed to personally provide the
25  management of EuroTech at no cost to the investors or the company, and that
26  once the business was profitable, he would then receive a salary for his
27  management services. At the time he made these representations Mr. Blakey
28  knew that he was nearly broke, and he knew that he was going to use his position

as "manager" of EuroTech to cause the company to issue regular paychecks to himself. Which thing he did; from the beginning he caused the company to issue regular paychecks to himself.

57.    Consequently, from 2004 onward, so long as he owned an interest in EuroTech, Blakey received a regular paycheck from EuroTech. During this entire period EuroTech was unprofitable and thus Blakey's receipt of a pay check was in violation of his investment promises to the Fodors and other investments.

58.    Further, even when he was receiving a paycheck for his management services, during most of the time he was not present at EuroTech and in fact did no work for EuroTech, and was thus abusing his position as an investor, officer and director to receive full time pay for doing no work whatsoever. This was in breach of his duties to the other investors, the company and Florida law.

## TRANSACTION NUMBER 2

59.    On November 7, 2005, Mr. Dean sold his 1/3 interest in EuroTech to EuroTech for $180,000 (e.g. the membership interest was redeemed by the company), and demanded that sums loaned to EuroTech by Mr. Dean's affiliated company, MSI Concrete Company, Inc. be repaid in the amount of $461,162.67.

60.    EuroTech paid these sums with monies received from the $130,000 Dr. Fodor wired to the company on October 5, 2005, and from sums the company received from Goldsmith.

## TRANSACTION NUMBER 3 (combined with Transaction 2)

61.    For the $130,000 paid by Dr. Fodor, mentioned in the last paragraph, EuroTech sold to the Fodors an additional 5% interest in EuroTech.

62.    Defendant Goldsmith purchased the rest of Dean's redeemed shares and became an investor.

///

///

## TRANSACTION NUMBER 4

63.     On March 1, 2008, Mr. Blakey sold his membership interest in EuroTech to Defendant Goldsmith for $60,000. Under the terms of the EuroTech Operating agreement Blakey had a duty to disclose this sale to both Dr. Fodor and Defendant Goldsmith and a duty to allow each of them to buy up to one-half of the offered membership interest.

64.     Thus the price Mr. Blakey charged the Fodors in 2004 was $26,000 per percentage point, and the price Mr. Blakey charged Mr. Goldsmith in 2008 was $2,118 per percentage point.

65.     Rather than disclose this sale by Blakey to Defendant Goldsmith, Goldsmith and Blakey entered into an agreement of conspiracy (i) that this sale was to held in strict confidence between the two of them and that neither person would disclose it to Dr. Fodor, (ii) that Goldsmith, Blakey and EuroTech would hide from the Fodors the business records of EuroTech, including balance sheets and income statements; (iii) that Goldsmith would cover up the fact that Blakey had failed to invest his $350,000, had received a pay check in breach of his representations he would not be paid for management until after the company was profitable, and (iv) that Mr. Blakey was receiving pay checks when he was absent from the company and doing no work for the company. Blakey agreed that Goldsmith could install his son (or perhaps it was his son-in-law) as the manager of EuroTech, that the son (son-in-law) would receive a full-time paycheck, and would not have to actually work full-time for the company, or roughly, that he would step into the shoes vacated by Blakey.

66.     In furtherance of this conspiracy, Goldsmith and Blakey consummated the sale to Goldsmith of Blakey's membership interest, and installed the son (son-in-law) as manager.

67.     Dr. Fodor discovered the secret sale, but was unaware of the scope of the conspiracy of Blakey and Goldsmith.

68.     Furthermore, on June 16, 2008, pursuant to section 10 of the Operating Agreement, Peter Fodor made written demand on Mr. Goldsmith that he sell to him 50% of the shares he purchased from Mr. Blakey for $30,000.

69.     Thereafter, Dr. Fodor was able to rectify the failure of Blakey, Goldsmith and EuroTech to allow him to purchase one-half of the membership interest sold by Blakey to Goldsmith, but was not able to rectify the other harmful events covered by the conspiracy, which events, including the failure to disclose company financial information, continues to the present day.

70.     With regards to Transaction 4, Goldsmith and Blakey failed to disclose the true facts regarding the financial affairs of EuroTech to the Fodors, including the conspiracy referred to above, which conspiracy included hiding the business records, hiding that Blakey had not invested $350,000, hiding the fact that Blakey had taken a paycheck when he had promised not to, and the fact that Goldsmith's son (son-in-law) was receiving an exorbitant salary, just as Blakey had.  These failures to disclose were material to the decision of Dr. Fodor as to whether to invest in buying for $30,000 one-half of Blakey's interest in the company, or not. Blakey's state of knowledge on this matter is further addressed in the last paragraph describing this investment, below.

TRANSACTION NUMBER 5

71.     From time to time since 2005, Mr. Blakey has asked that the Fodors pay certain "losses" of EuroTech or "invest more" into EuroTech, and the Fodors have expended approximately $160,000 in EuroTech.

72.     At no time prior to the investment any of these investment transactions, did Blakey give to Fodors a prospectus, financial disclosures, business plan or the like, except for the initial false income statement and balance sheet overstating the worth of the inventory. Further, there has never been held

1   any meetings of members or managing members, which are required by Florida

2   law on an annual basis.

3       73.   The Fodors have never been paid anything for their investment, not a

4   share of profits, not a payment on the note, or anything else. EuroTech has failed

5   to make any payments on the $300,000 that has been due in full since August 1,

6   2010, yet EuroTech has had funds available to make lawful payments on the note

7   to the Fodors.

8       74.   Further, Goldsmith has supervised the running of EuroTech and has

9   paid to his son (son-in-law) an exorbitant salary in order to reduce the profitability

10  of EuroTech, overstate expenses and avoid distribution of any profit to the

11  Fodors.

12      75.   Subsequent to Mr. Blakey's sale of his interest to Dr. Goldsmith, Dr.

13  Goldsmith has had his sons run the business, but he has continued in Mr. Blakey's

14  conspiracy of not holding annual meetings of members or managing members,

15  not providing any financial information, not paying anything to the Fodors.

16      76.   It is revealing that Mr. Blakey, who never put up his $350,000, sold

17  his interest in EuroTech to Mr. Goldsmith for $60,000. That $60,000 represented,

18  supposedly, a 1/3 interest in the company (e.g. represented by the contribution of

19  the Fodors) AFTER the business had profited from the supposed expert leadership

20  of Blakey, of course, getting $60,000 for nothing is something. It is further true

21  that Blakey failed to work at the business even though he took a pay check, failed

22  to develop the promised internet business, failed to have contacts to drive sales,

23  etc., that he had promised to the Fodors in June 2004 when the business was set

24  up by Blakey and the Fodors and Mr. Dean.

25      77.   Finally, on March 31, 2011, at their meeting at Factor's Deli Mr.

26  Blakey confessed to Dr. Fodor that from the beginning he was going to take a

27  salary from EuroTech, but that he was broke at the time, living in Florida, needed

28  a job and was under pressure from his wife to come up with money. He stated

1   that he had formed the opinion back then it was unfair for other investors to

2   expect him to keep his promise to work without being paid until the business was

3   profitable, and that thus he had taken a pay check in violation of his promises. He

4   apologized, asked for forgiveness, and as previously described in greater detail,

5   promised that he would repay to the Fodors their investment in EuroTech by

6   giving them one-half of all he earned until they were fully paid for the money they

7   lost on all of the investments. He never paid them a dime.

8

9   ### Investment 3: Don Johnson Record Deal

10      78.    When the Fodors first met Mr. Blakey, he told them that he was a

11  business executive in the music recording industry. Plaintiffs do not dispute the

12  veracity of this representation.

13      79.    In June, 2006, Mr. Blakey approached Dr. Fodor and said that his

14  "friend" Don Johnson had signed a recording contract with him, that Don was a

15  wonderful singer, and he invited Dr. Fodor to invest in producing the album

16  $50,000, stating he, Mr. Blakey would put up the other $50,000. He stated that

17  the terms of the investment was that he, Mr. Blakey would produce the album,

18  Mr. Johnson would be the artist, and that from the proceeds Mr. Johnson would

19  receive 50%, and that Dr. Fodor and Mr. Blakey would each receive 25% of the

20  profits.

21      80.    He stated it would probably take several months to produce the

22  album, but that it should hit the retail market in 2007 or 2008.

23      81.    The Fodors invested $50,000 on June 26, 2006 by Check # 9453 made

24  payable to "Michael Blakey".

25      82.    A couple of months later, in or about August 2006, Mr. Blakey invited

26  Dr. Fodor to lunch with Don Johnson at the Beverly Wilshire Hotel. As they were

27  walking into the hotel, Mr. Blakey told Dr. Fodor to not mention to Don Johnson

28  the "record deal", that this lunch was a social lunch, not a business lunch, that Mr.

1    Johnson was an intensely private person and that he would be angry if Dr. Fodor
2    mixed the social lunch with business. Mr. Blakey, Mr. Johnson and Dr. Fodor had
3    lunch together as planned.  Dr. Fodor in reliance on this representation did not
4    mention the record deal to Mr. Johnson at lunch, and neither Mr. Johnson nor
5    Mr. Blakey mentioned the recording contract spontaneously on their own.
6    Plaintiffs allege the purpose of the meeting with Don Johnson was a ruse to prove
7    to Dr. Fodor that Mr. Blakey had a personal relationship with Don Johnson and by
8    inference prove the validity of Dr. Fodor's $50,000 investment.

9         83.    Mr. Blakey knew when he accepted the Fodor's check there was no
10   recording contract with Mr. Johnson, that Mr. Blakey had no intention to enter
11   into a recording contract with Mr. Johnson, and this was just another method to
12   extract funds from the Fodors to be converted to his own personal use.

13        84.    From 2004, Dr. Fodor and Mr. Blakey had the habit of meeting on a
14   regular basis, usually twice weekly, to discuss among other things the status of
15   the Fodors' investments with Mr. Blakey. These meetings continued until 2009. At
16   that time the meetings became less regular, but still took place usually twice a
17   month, through late 2010. Starting on or about January 10, 2007, during these
18   meetings Dr. Fodor asked Mr. Blakey at these meetings the status of the Don
19   Johnson record project.

20        85.    On each occasion, Mr. Blakey told him that it was going slowly due to
21   conflicts with Mr. Johnson's movie schedules. Dr. Fodor also on these occasions
22   asked Mr. Blakey for a copy of the signed contract with Mr. Johnson, at least
23   monthly. Mr. Blakey on each occasion confirmed that he had the signed contract
24   and stated that he would provide Dr. Fodor with a copy. Mr. Blakey never
25   provided a copy of the signed recording contract.

26        86.    At the meeting at Factors Deli on March 31, 2011, Dr. Fodor asked for
27   his $50,000 to be refunded. Mr. Blakey stated that he had arranged for the band
28   and the recording studio, and that the $100,000 ($50,000 from the Fodors and

1  $50,000 from Mr. Blakey) had been spent on these pre-production costs, and that
2  there was no money to refund.

3      87.   The truth is that Mr. Blakey knew on June 26, 2006 when he
4  accepted Dr. Fodor's check for $50,000, he did not have a recording contract with
5  Don Johnson, he knew he never had the intention to enter into a recording
6  contract with Don Johnson, he knew that Don Johnson was unaware of any
7  recording contract with Mr. Blakey,  and that is why (i) Mr. Blakey did not give Dr.
8  Fodor a copy of the signed recording contract he said he had with Don Johnson,
9  (ii) Mr. Blakey told Dr. Fodor not to discuss the recording contract at the "social"
10  lunch with Don Johnson in August 2006, (iii) Mr. Blakey has never produced any
11  receipts or other records for the $100,000 pre-production costs he supposedly
12  spent on a recording studio, band, etc., and (iv) why Mr. Blakey never himself
13  invested the $50,000 as he claimed. The entire thing was a fabrication of lies
14  created by Mr. Blakey to induce the Fodors into investing their money. Plaintiffs
15  are informed, believe and thereon allege that Mr. Johnson has never heard of this
16  recording contract.

17      88.   The Fodors received nothing for their investment and further allege
18  that Mr. Blakey did not put up his promised $50,000 into the project.

19      89.   On March 31, 2011, at their meeting at Factor's Deli Mr. Blakey
20  confessed to Dr. Fodor that the Don Johnson was not real, and Mr. Blakey stated
21  that he would pay them back their $50,000, which thing he has never done.

22
23      **Investment 4: Charlie Air LLC**
24      **Transaction Number 1**

25      90.   In 2004, Mr. Blakey formed Charlie Air LLC as an investment vehicle.
26  It was to own two jets and make money leasing them to jet charter companies.

27      91.   Mr. Blakey explained to the Fodors that this was a "cash flow" deal,
28  meaning that it would make money each month by renting out the two jets, that

1    the rents would exceed the expenses, and that the profits would be distributed to
2    the investors once a month or once a quarter.

3         92.    He further stated that he had his eye on purchasing a couple of used
4    jets for Charlie Air LLC, that they would cost $4,000,000, and that the investors
5    would be him for $2,000,000 and the Fodors for $2,000,000.

6         93.    As with the other investments, Mr. Blakey represented on or about
7    March 26, 2004, that he would be the day to day manager of Charlie Air, that he
8    was a "master pilot" and could fly private jets. He further represented at that
9    time that because of his aviation experience he was best qualified to run Charlie,
10   but that he would not be paid any money as a salary or wages until such time as
11   the company was profitable and could afford to reimburse him for his time.

12        94.    He also represented that he had experience not only flying private
13   jets but also running private jet leasing companies and that he had leased out
14   private jets owned by many of his famous clientele.

15        95.    He stated that his famous clientele would be customers of Charlie
16   Air's jets because he could direct them to use the jets for their private travels.

17        96.    In truth, Mr. Blakey knew from the beginning he was never going to
18   put in his share of the investment money. This was the same as with the other
19   investments. He knew this because he did not need any investment money but
20   the Fodors $2,000,000 because the jets he was going to buy did not cost
21   $2,000,000 each, but rather both of them together cost approximately
22   $2,000,000. Thus, by the Fodors putting in $2,000,000, Blakey had the money to
23   buy the jets. He knew this because this was his plan from the beginning and he
24   had negotiated, prior to this transaction being funded by the Fodors, the purchase
25   price for the two jets.

26        97.    The business had expenses and by not putting up his fair share, Mr.
27   Blakey forced the entire operating costs away from his shoulders on to the
28   shoulders of the Fodors.

SECOND AMENDED COMPLAINT   - 42 -

98.     Further, by misrepresenting his experiences and qualifications, he built confidence in the Fodors as to his abilities when the true facts were that he lacked, and knew he lacked, the expertise to actually find clients for the charter business and he failed to provide his "fabulous clientele" as air charter customers.

99.     Indeed, Mr. Blakey further burdened the company and harmed the investors because from the beginning he paid himself a monthly wage when he said he would not.

100.    As to not charging any wages for his services in the startup phase, Mr. Blakey explained once again to the Fodors that this was one of the services he offered his investors. Mr. Blakey knew he was never was licensed to fly jets, never had experience leasing aircraft, not for his clients or for anyone else, and that he knew he was lying when he said he would not take wages during the startup phase. The truth he knew from the beginning he was going to pay himself large sums of money for his "management".

101.    In violation of his commitments, he never did anything to document this transaction for the Fodors.

102.    He also knew from the beginning that he could not furnish movie stars and recording stars and such as clientele for Charlie Air but used this falsehood to encourage the Fodors to believe that there would be plenty of people to rent the jets and that they could invest their money safely.

103.    Mr. Blakey described the investment as that both he and the Fodors would each invest $2,000,000 into the company, and the company would buy two business jets, registration numbers N150CA and N360CA.  The ownership was to be 50-50, half owned by Blakey and half by the Fodors.

104.    Mr. Blakey said the planes cost approximately $1.9 million each, and the approximately $100,000 extra each was to be used to cover setting up the business. The Fodors paid their invested moneys to Mr. Blakey, or as he directed.

105.    The Fodors invested as follows:

a.     3/26/04 transfer to Charlie Air the amount of $101,674.00. Approximately one week prior to this transfer, and again on the date of the transfer, Blakey confirmed that this was part of the down payment for first of the two jets, that they were buying two jets at $2,000,000 each for a total of $4,000,000, and that he, Mr. Blakey was putting up $2,000,000 of the $4,000,000 at the same time the Fodors were.

b.     This same day there was a second bank transfer by the Fodors to Charlie air in the amount of $967,246.73, as part of this same transaction, again on the same terms and as part of the same set of representations by Mr. Blakey.

c.     The true facts were known to Blakey that day and they were that he, Blakey, did not put up any money for the purchase of the jets, but used the Fodors money. It was further true that Mr. Blakey did take out secret wages from Charlie Air, contrary to his promises to work for free until the business grew enough to support his wages.

d.     On 9/8/2004 the Fodors paid by check 9443 $119,500 to Charlie Air. A couple of days before that date, and reiterated by Mr. Blakey again on that date, Mr. Blakey had telephoned and informed that business expenses had to be paid in twice that amount and that that he, Blakey, was paying his own $119,500 to help with the expenses. The true facts were that Mr. Blakey contributed nothing and used a portion of the Fodors' $119,500 for his own purposes.

e.     On 11/10/2004 by CHIPS Debit the Fodors paid another $100,000 to Charlie Air. A couple of days before that date, and reiterated by Mr. Blakey again on that date, Mr. Blakey had telephoned and informed that business expenses had to be paid in twice that amount and that that he, Blakey, was paying his own $100,000 to help with the expenses of

Charlie Air. The true facts were that Mr. Blakey contributed nothing and used a portion of the Fodors' $100,000 for his own purposes.

f.    On 11/29/2004 by Wire Transfer the Fodors contributed another $50,000 for the operating expenses of Charlie Air. A couple of days before that date, and reiterated by Mr. Blakey again on that date, Mr. Blakey had telephoned and informed that business expenses had to be paid in twice that amount and that that he, Blakey, was paying his own $50,000 to help with the expenses of Charlie Air. The true facts were that Mr. Blakey contributed nothing and used a portion of the Fodors' $50,000 for his own purposes.

g.    On 7/20/2006, by check 9701 the Fodors paid to "Michael Blakey, Inc." the sum of $100,000 for the operating expenses of Charlie Air. A few days before that date, and reiterated by Mr. Blakey again on that date, Mr. Blakey had telephoned and informed that business expenses had to be paid in twice that amount and that that he, Blakey, was paying his own $100,000 to help with the expenses of Charlie Air. He stated that he had already advanced funds to Charlie Air because of an emergency, and that what the Fodors needed to do was to reimburse him for one-half of the funds he had already advanced to Charlie Air. The true facts were that Mr. Blakey had advanced nothing and used all of the $100,000 for his own purposes.

106.   At no time were the Fodors given any prospectus, business plan, financial statement, financial projections, or other information regarding the risks or qualifications of the investment.

107.   Mr. Blakey bought the two jets but failed to disclose the purchase price was much less than the purchase price he had represented to the Fodors.

///

///

TRANSACTION NUMBER TWO

108.  Sometime later, Mr. Blakey found another investor, Defendant Goldsmith, and Goldsmith bought into Charlie Air for approximately $1,300,000. Mr. Blakey gave to Dr. Fodor $500,000 of the purchase price. It appears that Mr. Blakey kept $800,000 of this, $300,000 more than was his share.

109.  The Fodors were never paid any other funds for their investment in this company.

110.  Plaintiffs are informed, believe and thereon allege that Mr. Blakey never invested any of his own moneys in this transaction, but rather used the Fodor's moneys to grubstake himself.

111.  The business proved unsuccessful and in October 2007 Mr. Blakey assigned his interest in Charlie Air to Peter Fodor and Goldsmith. The assignment was drafted by Mr. Blakey's lawyer, a Mr. Raiskin. This lawyer expressed in writing he had a conflict of interest on this transaction because he also represented the Fodors. The lawyer included a release. The Fodors were not represented by any impartial, non-conflicted lawyer.

112.  Not knowing at the time that the two aircrafts had been purchased for about $2,000,000, the Fodors signed the agreement without the advice of independent counsel. Plaintiffs are informed, believe and thereon allege that the assignment was obtained under duress in an unfair manner without proper warnings that they should seek their own independent legal counsel, and that as such, the assignment was obtained in bad faith and that for these reasons, the release is ineffective.

113.  On 11/29/07, Kimberly Blakey sent a letter to Goldsmith and Fodor regarding Charlie Air LLC. In that letter she stated that Blakey was going to give her a 1/3 interest in Charlie Air LLC as part of their divorce and that Blakey told her that this 1/3 interest would provide her with approximately $75,000 in annual income, her share of the profits from the operation of the airplanes.

SECOND AMENDED COMPLAINT   - 46 -

114.   On 2/4/2008, Blakey sent a letter to the Fodors with regard to his ex-wife's involvement in Charlie, as it related to their divorce proceedings. In that letter, Blakey told the Fodors that he always was of the belief an aircraft charter business was NOT an investment that would make any profit, but rather was an investment that was worthwhile for its tax write offs. He denied ever telling anyone that such an investment would produce any profits. This contradicted what he had told the Fodors prior to their investment and what he told his wife (as related by her) that this investment was profitable.

115.   In the 2005 tax returns, returns prepared under the direction of Blakey while he was managing Charlie Air LLC, there is shown $2,605,870 of contributed capital, allocated as follows: Blakey $755,870, Fodor $550,000 and Goldsmith $1,300,000. It should be recalled that the 2004 investment by the Fodors was $1,338,420.73, as shown specifically above.

116.   In terms of capital contribution, other financial records maintained by Blakey indicates capital contributions by Blakey of $834,731, Fodor $547,065 and Goldsmith $40,898. So somehow Goldsmith's capital contribution went from $1,300,000 to $40,898, while the Fodors was reduced by $3,000 and Blakey's went up about $80,000.

117.   Thus, according to the financial records and tax returns maintained by Blakey, he contributed one and one-half times the amount of the Fodors' capital contribution, or about $1,950,000.  This contradicts the financial information noted above.

118.   There was a dispute between Goldsmith and the Fodors as to certain business matters related to Charlie Air LLC, but those matters were settled by written agreement between the Fodors and Defendant Goldsmith and there was a specific narrow release that was part of said settlement agreement. Plaintiffs do not sue Goldsmith for the narrow matters included by this settlement agreement between them and Goldsmith.

119.   In 2011 the Fodors because suspicious of Mr. Blakey's qualifications and a fund raiser and investment advisor and they researched the airplanes. They discovered that Mr. Blakey had bought the two aircraft for approximately $1,000,000 each, not the $1,900,000 each purchase price that he stated. Mr. Fodor did not discover the true price paid for the airplanes until he sold them in 2011 and found paperwork documenting their purchase price by Mr. Blakey.

120.   Finally, on March 31, 2011, at their meeting at Factor's Deli Mr. Blakey confessed to Dr. Fodor that from the beginning he was going to take a salary from Charlie Air, but that he was under pressure from his wife to come up with more money. He stated that he had formed the opinion back then it was unfair for other investors to expect him to keep his promise to work without being paid until the business was profitable, and that thus he had taken a pay check in violation of his promises. He apologized, asked for forgiveness, and as previously described in greater detail, promised that he would repay to the Fodors their investment in Charlie Air LLC by giving them one-half of all he earned until they were fully paid for the money they lost on all of the investments, including Charlie Air. He never paid them a dime.

### Investment 5: Chanel Air

121.   This investment was similar to Investment 5, Charlie Air. Except that the aircraft was much larger and more expensive.

### TRANSACTION NUMBER 1

122.   Again, on or about the middle of August, 2006, Mr. Blakey telephoned the Fodors. He advised the Fodors to invest $4,000,000 in the purchase of a Canadair CI-600 Challenger jet, tail number N310PE and re-registered as N604AC. Mr. Blakey stated he would invest the other $4,000,000 to purchase the jet, and that the jet had a price of $8,000,000.

123. The Fodors paid $4,000,000 to Chanel Air by CHIPS Debit on 8/25/2006. Mr. Blakey bought the jet.

124. The true facts were that Mr. Blakey did not invest $4,000,000 as promised. In fact, the actual purchase price of the jet was $3,405,000, $4,595,000 less than he stated. Mr. Blakey kept the $595,000 for himself, and never put in the $4,000,000 he said he did. Plaintiffs are informed, believe and thereon allege that he used this money to buy his home, multiple motor vehicles and other property. Thus, Blakey failed to disclose the material fact that the plane was $4,000,000 cheaper than he said it was, and failed to disclose he invested nothing of the $4,000,000 he claimed to invest in the company.

125. Once again, at no time were the Fodors given any prospectus, business plan, financial statement, financial projections, or other information regarding the risks or qualifications of the investment.

126. The 2006 tax return for the company, which return was prepared under the direction of Blakey as manager of the business, and from the financial records kept by Blakey as manager of the business, showed that the purchase price of the airplane on the company records was $3,800,000, and that Mr. Blakey contributed capital of $1,900,000 for his share of the purchase price, and that the Fodors contributed capital of $1,900,000 for their share of the purchase price. The tax and financial records did not disclose the true fact that the Fodors put $4,000,000 into the company, and did not disclose the true fact that Blakey contributed nothing to the company. Blakey knew from the beginning that he was not going to reflect in the books of the company the actual investment by the Fodors, knew that he was going to take half of the Fodors' money and claim it as his capital contribution. Further, Blakey did not run the $3,800,000 purchase of the jet through the company's financial records, thus concealing the entire purchase transaction from the corporation.

///

TRANSACTION NUMBER 2

127.   This business also proved unsuccessful and in October 2007 Mr. Blakey assigned his interest in Chanel Air to Peter Fodor. The assignment was drafted by Mr. Blakey's lawyer and included a release. The Fodors were not represented by a lawyer. Mr. Blakey told them the agreement was simple and that he advised them not to get an attorney involved.

128.   At the time of this transaction, Blakey failed to disclose that the plane was purchased for $3,800,000 not $8,000,000, failed to disclose that he had not contributed anything to the purchase, failed to disclose that he had booked himself on the corporate records as an equal owner with the Fodors in spite of not having invested a dime. He knew he then, as he knew in 2006, the purchase price of the aircraft, the amount he contributed ($zero), the amount the Fodor's contributed ($8,000,000), and the allocation of the ownership interests (50% to Blakey and 50% to the Fodors). He knew this because he maintained the corporate financial and business records, and had the taxes done per his instruction. Further his failure to correctly book the purchase of the jet in the corporate records, had a material effect on the value of the transaction to the Fodors, where they accepted the transfer of his membership interest to them, as being fair and reasonable.

129.   Not knowing then the aircraft had been purchased for less than $4,000,000, the Fodors signed the agreement without the advice of counsel. Plaintiffs are informed, believe and thereon allege that the assignment was obtained under duress in an unfair manner without proper warnings that they should seek their own independent legal counsel, and thus the assignment was obtained in bad faith and that for these reasons, the release is ineffective.

130.   Once again, as to each of these investments made by the Fodors, they were supposed to be matched by Mr. Blakey. In truth, Mr. Blakey never put in any money and he knew from the beginning he was not going to contribute